UNITED STATES of America, Plaintiff,

v.

**Fletcher SAPP and Ronald Sapp, Defendants.**

**Nos. 93–20064–01–DES, 97–3181–01–DES.**

United States District Court,
D. Kansas.

Dec. 8, 1997.

Order Denying Reconsideration
Jan. 14, 1998.

C. Maxwell Logan, Norris, Keplinger & Logan, L.L.C., Overland Park, KS, for Fletcher Sapp.

Tanya J. Treadway, Office of United States Attorney, Kansas City, KS, for U.S.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on defendants' Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. 120), defendants' Motion for New Trial, defendants' Motion to Authorize Discovery (Doc. 137), defendants' Motion to Expand the Record and for Other Appropriate Relief (Doc. 136), defendants' Motion for Evidentiary Hearing (Doc. 140), and defendants' Motion for Pre–Trial Conference (Doc. 143). For the reasons discussed below, all of the above motions are denied.

## I. INTRODUCTION

The defendants are brothers who jointly operated a number of businesses. In 1990, the defendants began experiencing financial difficulties. After the defendants defaulted on some of their loans at First State Bank ("First State"), they began negotiating for additional funds from Midland Bank ("Midland") to pay off some of their debts at First State. At the same time, defendants attempted to persuade First State to discount some of their delinquent loans.

First State agreed to discount some of defendants' outstanding loans by approximately $279,000, leaving them $280,000 in

debt on the discounted loans, which First State thought would be paid by funds that the Sapps were going to obtain from Midland. This agreement also allowed the defendants to bring other loans current and to turn over the collateral in full satisfaction of other loans. Meanwhile, defendants reached an agreement with Midland that allowed "$850,000 to be made available to [defendants] to settle pending litigation and their indebtedness at First State." In order to draw on the funds, the Midland agreement stated that the defendants needed both Midland's approval and releases of their indebtedness with other creditors.

Defendants then forged a letter from First State to Midland. The forged letter requested payment of approximately $405,000 to settle defendants' debt to First State, which was $125,000 more than was needed to pay off the discounted loans. Before disbursing the loan monies, however, Midland discovered the discrepancy between the amount requested in the letter and the amount First State expected the Sapps to request to pay off the discounted loans. When confronted with the forgery, the defendants admitted forging the letter.

The defendants were charged with violating 18 U.S.C. §§ 1014 and 1344(2). The jury found the defendants guilty of bank fraud in violation of 18 U.S.C. § 1344(2), but acquitted them of making a false statement to a federally insured financial institution in violation of 18 U.S.C. § 1014. The defendants were each sentenced to twenty-one months incarceration and were ordered to pay $279,000 jointly in restitution to First State. Defendants appealed their convictions and sentences to the Tenth Circuit Court of Appeals, which affirmed the results reached by the trial court.

## II. DISCUSSION

### A. Ineffective Assistance of Counsel Because Trial Counsel Failed to Present Certain Testimony and Evidence

The defendants claim that they were denied the effective assistance of counsel in violation of the Sixth Amendment of the United States Constitution. To establish a claim of ineffective assistance of counsel, the defendants must show: (1) "that counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984); and (2) "that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. at 2064. In order to meet the second prong of this test, the defendants must demonstrate "that counsel's errors were so serious as to deprive the defendant[s] of a fair trial, a trial whose result is reliable." *Id.* There is a presumption that the attorney's conduct comes within "the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065.

In this case, the defendants make the following allegations to support their ineffective assistance of counsel claim: (1) that their trial counsel should have presented testimony from James Wirken and Brian McCallister, attorneys who represented the defendants in negotiations to settle lender liability claims against Midland; (2) that their trial counsel should have presented testimony from Chris Henry, the attorney who represented Midland during the negotiations of the lender liability claims; (3) that their trial counsel should have presented testimony from Lee Greif, chairman and majority shareholder of Midland who participated in the negotiations of the lender liability claims; (4) that their trial counsel should have presented evidence that Bruce Rhoades, a government witness and president of Midland, was under investigation for conduct for which he was eventually banned from employment in the banking industry; and (5) that their trial counsel should have elicited testimony from Larry Morris, a CPA who testified on behalf of the defendants, that the figures in the forged letter were an accurate reflection of the settlement agreement that the defendants had with First State.

■ To support defendants' first and second allegations on this claim, the defendants assert that James Wirken, Brian McCallister, and Chris Henry would have testified that they, along with the Sapps and Lee Greif, were the parties involved in negotiating the settlement which revolved around the $850,-

000 line of credit, which was at issue in this case, and that Bruce Rhoades was not involved in the negotiations as he testified at trial. Furthermore, the defendants assert that these three attorneys would have testified that the line of credit was part of the settlement of the Sapps' lender liability claims against Midland, that it was the intent of the parties that the Sapps would have personal access to part of the line of credit, and that the line of credit would be used to pay off other creditors besides First State, in opposition to the testimony of Bruce Rhoades.

The court has extensively reviewed Bruce Rhoades' testimony in connection with this and other claims made by the defendants and concludes that the defendants were not prejudiced by the failure of trial counsel to call these witnesses to rebut the testimony of Bruce Rhoades. Rhoades himself admitted, on cross-examination, that he was not personally involved in all of the negotiations for the $850,000 line of credit at Midland, Rhoades Tr. at 72–73; that the line of credit was established, in part, to prevent the Sapps from suing Midland, *Id.* at 72; and that money from that line of credit was, in fact, disbursed to the Sapps personally and to other creditors. *Id.* at 78.

Furthermore, the defendants were convicted of bank fraud based upon the letter bearing the forged signature of First State's president, David Herndon, in which they requested a larger amount of money than was anticipated by First State. The testimony of these three witnesses would be to establish the intent of the parties to the settlement with Midland and to discredit Bruce Rhoades. Thus, these three potential witnesses could not offer any evidence which would negate the fact that they forged Herndon's signature on the letter or establish the Sapps' intent in forging the letter; nor, could any of these three testify regarding the terms of the agreement with First State. Therefore, the court concludes that, even assuming that their trial counsel's representation fell below an objective standard of reasonableness, the defendants were not prejudiced by the failure to call these three attorneys as witnesses.

In their third allegation on this claim, the defendants assert that their trial counsel should have called Lee Greif, chairman of Midland and a participant in the negotiations for the Midland settlement, as a witness. The court finds that the above discussion regarding the three attorneys applies to Lee Greif, as well. In addition, the court notes that the government has presented an affidavit from Lee Greif's attorney that he would have been advised to assert his Fifth Amendment rights and decline to answer any substantive questions. Thus, it seems very unlikely that the defendants would have obtained any helpful testimony from Greif, and the court concludes that they were not prejudiced by the failure to call this witness.

For their fourth allegation on this claim, the defendants assert that their attorneys failed to present evidence that Bruce Rhoades was under investigation for conduct for which he was banned from employment in the banking industry. Again, the only purpose this evidence would have served would be to attempt to discredit Rhoades. The defendants' trial counsel did discredit Rhoades on cross-examination in all of the areas discussed above. Furthermore, neither side has presented any evidence which would indicate whether the investigation of Rhoades had commenced at the time of this trial. Rhoades did not enter into a consent agreement with the FDIC until December of 1995. However, even if the investigation had been commenced by the time of this trial, this evidence would not have addressed the conduct for which the Sapps were convicted. It would only have served to further discredit Rhoades. Thus, even assuming that trial counsel's performance fell below an objective standard of reasonableness, the court concludes that the defendants were not prejudiced by the failure to introduce this evidence.

The last allegation presented by the defendants on this claim for ineffective assistance of counsel is that their trial counsel should have elicited testimony from Larry Morris, the CPA who assisted the Sapps with their defense, to the effect that the terms of the forged letter were an accurate reflection

of the terms of the First State settlement. The court found in its review of the record that trial counsel put forth this theory at trial, although Larry Morris was not questioned on this theory. The jury apparently found the testimony of Herndon to be more persuasive. Therefore, the court again concludes that the defendants were not prejudiced by the failure to elicit this testimony. Thus, the defendants have failed to establish that they were denied the effective assistance of counsel on this claim.

## B. Ineffective Assistance of Counsel Because the Defendants' Counsel had a Conflict of Interest

■ In support of this claim, the defendants allege that the firm of Stinson, Mag & Fizzell, which originally served as joint counsel for the defendants and continued to serve as lead counsel after Fletcher Sapp obtained separate counsel, had a conflict of interest because the firm had represented Lee Greif and Midland. Furthermore, the defendants allege that the firm obtained a waiver of the conflict from Greif, but not from the defendants. The defendants allege that the firm did not call Greif, Henry, Wirken, or McCallister as witnesses as a result of this conflict and the firm's efforts to protect Greif.

Rule 83.6.1(a) for the United States' District Court for the District of Kansas states that this court has adopted the Model Rules of Professional Conduct, as adopted by the Kansas Supreme Court, as the standard for the professional conduct of attorneys practicing before this court. Rule 1.9 of the Model Rules of Professional Conduct, as adopted by the Kansas Supreme Court, states as follows:

A lawyer who has formerly represented a client in a matter shall not thereafter:

  (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

  (b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client

or when the information has become generally known.

MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.9 (emphasis added). This differs from the general rule governing conflicts of interest found in Rule 1.7, which states as follows:

  (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

    (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

    (2) **each client consents** after consultation.

  (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

    (1) the lawyer reasonably believes the representation will not be adversely affected; and

    (2) **the client consents** after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.7 (emphasis added).

In this case, the defendants have not submitted any evidence that Stinson, Mag & Fizzell had an ongoing attorney-client relationship with Greif and Midland at the time that they were representing the Sapps. In fact, their allegations and evidence supports a finding that Greif and Midland were **former** clients of Stinson, Mag & Fizzell. All of the billing documents and letters submitted to show an attorney-client relationship between Greif, Midland, and Stinson, Mag & Fizzell are dated 1984 and 1985. In addition, all of these documents appear to relate to the creation of Midland, not to any of the actions which were at issue in this case. Therefore,

the actions of Stinson, Mag & Fizzell were in accordance with Rule 1.9, and the Sapps were not required to sign a waiver.

Even if there was an ongoing attorney-client relationship, the defendants must show that there was (1) an actual conflict of interest and (2) that the conflict adversely affected their attorney's performance. *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980).

> [A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.... But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.... [T]he possibility of conflict is insufficient to impugn a criminal conviction.

*Id.* at 349–50, 100 S.Ct. at 1718–19 (citations omitted). Furthermore, in order to prove an actual conflict existed, the defendants must show (1) "that some plausible alternative defense strategy or tactic might have been pursued" and (2) "that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *United States v. Fahey,* 769 F.2d 829, 836 (1st Cir.1985); *accord, United States v. Bowie,* 892 F.2d 1494, 1500 (10th Cir.1990).

The defendants claim that this conflict prevented their attorneys from calling any of the people who participated in the negotiations of the Midland agreement as witnesses. However, defendants have not shown how this would be a plausible alternative defense strategy nor how the alternative defense was in conflict with the attorney's other loyalties. The only purpose for the testimony of these witnesses would be to impeach or discredit Rhoades. The testimony of these witnesses would not negate the defendants' conduct in forging the letter. Therefore, the court concludes that the defendants have not shown an actual conflict or an adverse effect on their representation. As a result, the court finds that the defendants have failed to show that they were denied the effective assistance of counsel.

**C. Violation of Fifth Amendment Right to Due Process Because Prosecution Failed to Disclose Material Exculpatory Evidence**

For this claim, the defendants specifically allege that the government withheld a statement made by Herndon in a criminal referral filed with the FDIC, which was forwarded to the United States Attorney's Office, and that the government withheld information relating to Rhoades' conduct which caused him to be banned from employment in the banking industry. With regard to the defendants' claim that they were denied access to the criminal referral filed by Herndon, the court concludes that this allegation is without merit. Not only did the government provide the defendant with the opportunity to inspect its file, a review of the trial transcript reveals that the defense attorneys at trial did have access to the criminal referral because they cross-examined Herndon about information in the referral.

With regard to the defendants' allegation that the government withheld information concerning Rhoades' conduct which could have been used to discredit Rhoades at trial, the court notes that the defendants have presented no argument on this allegation in their supporting memorandum for their § 2255 motion. Instead, the defendants have simply requested additional discovery, claiming that the specifics regarding the conduct of Rhoades and Greif, along with the relevance to the defendants' case, "remain peculiarly available to the government." The defendants have given the court no definite idea of what they would hope to find in such further discovery, much less why this information would be relevant. Defendants were already aware of Midland's misconduct, through Greif and Rhoades, as it pertained to this case at the time of trial. Furthermore, the defendants have not even alleged that Rhoades came under investigation before or during the time of this trial. As previously mentioned, Rhoades did not enter into a consent agreement with the FDIC to be banned from employment in banking until December of 1995, and the order was not

issued by the FDIC until 1996. Thus, there is no evidence to show that the government withheld information relating to his investigation. The court concludes that further discovery to attempt to discredit Greif and Rhoades would not advance the defendants' current allegations since it would not change the fact that the defendants forged Herndon's signature on a letter to Midland which requested more money than Herndon expected—the conduct for which the defendants were convicted. Therefore, the court concludes that this claim is also without merit.

### D. Violation of Fifth Amendment Right to Due Process Because Prosecution Presented Material Testimony Which It Knew or Should Have Known Was False

For this claim, the defendants have outlined several different portions of testimony given by both Rhoades and Herndon which they claim that the government knew, or should have known, was false. The court will address these allegations of perjury individually.

■ In order to prove that the government suborned perjury, the defendants must show: "(1) that the witness actually lied in his testimony; (2) that the Government knew or should have known the testimony to be false; and (3) that there was a reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Neal,* 793 F.Supp. 1573, 1577 (W.D.Okla.1991), *aff'd* 968 F.2d 22, 1992 WL 149920 (10th Cir.1992). It is insufficient for a defendant to make bare allegations of perjury without supporting evidence. *See id.* at 1577–78.

■ The defendants first complain that the government knew, or should have known, that Rhoades perjured himself when he testified that he personally negotiated the agreement between Midland and the Sapps. The court finds, upon review of the transcript of Rhoades' testimony, that this issue was raised by defense counsel on cross-examination and that Rhoades admitted that he was not a party to all negotiations for this agreement. Rhoades Tr. at 72–73. Thus, the court finds that this discrepancy was presented at trial, and the defendants cannot now complain of perjury.

The defendants next argue that the government knew, or should have known, that Rhoades perjured himself when he testified that Midland did not intend for the defendants to receive any cash from the $850,000 line of credit. Upon review of the trial transcript, the court finds that this issue was also raised on cross-examination and that Rhoades admitted that the Sapps actually did receive $80,000 personally from the line of credit. Rhoades Tr. at 78. Again, the court finds that this issue was raised at the time of trial, and the defendants cannot now complain of perjury.

■ The defendants also complain that the government knew, or should have known, that Rhoades perjured himself when he testified that the $850,000 line of credit was the result of the defendants' application for a loan. The court has extensively reviewed the transcript of Rhoades' testimony and does not find such a statement in his testimony. However, the court notes that Rhoades did admit that the agreement served several purposes, including settling the Sapps' lender liability claims. Rhoades Tr. at 72–74. Furthermore, the defendants have not cited to the portion of the transcript where Rhoades allegedly made this statement. Therefore, the court finds that this allegation has no merit.

The defendants next argue that the government knew, or should have known, that Rhoades perjured himself when he testified that the calculation of the $850,000 was keyed into the amount of debt the Sapps had at First State. Upon review of Rhoades' testimony, the court finds that Rhoades admitted on cross-examination that approximately $380,000 from the line of credit went to pay creditors other than First State and that the Sapps received approximately $80,000 from the line of credit. Rhoades Tr. at 78. Therefore, the court finds that this issue was presented at trial and that the defendants cannot now complain of perjury.

■ The defendants also argue that the government knew, or should have known, that Rhoades perjured himself when he testified that he would not have agreed to the $850,000 line of credit if he had known that First State would accept $280,000 to settle with the Sapps. The defendants assert that this statement was false because Midland entered into this agreement with the Sapps before the Sapps settled with First State. The court finds this argument to be unpersuasive. The statement does not imply that Rhoades knew the amount that it would take for First State to settle with the Sapps. The testimony was that, if he had known the amount that First state needed when Midland settled with the Sapps, he would not have allowed them to have access to such a large line of credit. Since Rhoades did not know, this was a hypothetical statement and the court does not find that this was perjury.

The defendants next assert that the government knew or should have known that Rhoades perjured himself when he testified that the $850,000 line of credit was calculated exclusively on the amount of outstanding loans at First State. This is essentially the same argument that defendants previously asserted, and the court found that this issue had been raised on cross-examination during the trial.

The defendants also argue that the government knew, or should have known, that Rhoades perjured himself when he testified that Midland required a release, in the form of the forged letter, in order to have funds from the line of credit disbursed. Upon review of the transcript of Rhoades' testimony, the court found that Rhoades admitted on redirect examination that he would have given the Sapps money from the line of credit without any release or court order. Rhoades Tr. at 105–106. Therefore, the court finds that this issue was presented at the time of trial and that the defendants cannot now complain of perjury.

■ The defendants next allege that the government knew, or should have known, that Herndon perjured himself when he testified that he would not have discounted the defendants' loans by $279,000 if he had known that they were able to borrow $850,-000 from Midland. This allegation is much like the hypothetical statement to which the defendants referred in Rhoades' testimony. The defendants have not offered the court any evidence that Herndon knew the amount that the Sapps would be able to obtain from Midland until some time after he had entered into the agreement with the Sapps. Therefore, the court concludes that this is a bare allegation of perjury which is not supported by the evidence.

■ Finally, the defendants allege that the government knew, or should have known, that Herndon perjured himself when he testified that the Sapps had inflated the amount of money which was requested in the forged letter. Upon reviewing Herndon's testimony, the court finds that Herndon did not perjure himself in making this statement. It is evident from his testimony that he understood First State's agreement with the Sapps to include $280,000 from Midland and that the rest of the money needed to pay off or to bring the other loans current would come from some other source. Furthermore, the court notes that Herndon was cross-examined at some length on this topic by trial counsel. Herndon Cross–Examination Tr. at 47–61. Thus, this issue was also presented at trial, and the defendants cannot now complain of perjury. Therefore, the defendants have failed to establish a violation of their Fifth Amendment due process rights as a result of perjured testimony.

**E. Violation of Fifth Amendment Right to Due Process and to Indictment Only on a Finding of Probable Cause by a Grand Jury Because Government Pursued a Theory of Guilt on Count III Which Differed Substantially from the Indictment**

■ For this issue, the defendants claim that, because there was variance between the conduct which was alleged in the indictment and the theory of guilt and evidence produced at trial, the defendants were deprived of their due process rights.

■ "[Section] 2255 is not available to test the legality of matters which should have been raised on appeal." *United States v.*

*Allen,* 16 F.3d 377, 378 (10th Cir.1994). This procedural bar may be raised if it furthers " 'the interests of judicial efficiency, conservation of scarce judicial resources, and orderly and prompt administration of justice.' " *Id.* at 378–79 (quoting *Hines v. United States,* 971 F.2d 506, 509 (10th Cir.1992)). Since the defendants did not raise this issue on direct appeal, they are barred from raising it now in their § 2255 motion. *United States v. Barnes,* 43 F.3d 1484, 1994 WL 687369 at \*\*1 (10th Cir.1994).

### F. Motion for New Trial

■■■■ "A motion to grant a new trial 'is not regarded with favor and should be granted only with great caution, being addressed to the sound discretion of the trial court.' " *United States v. Stevens,* 978 F.2d 565, 570 (10th Cir.1992) (quoting *United States v. Sutton,* 767 F.2d 726, 728 (10th Cir.1985)). In order to prevail on a motion for a new trial based on newly discovered evidence, the defendants must establish that:

(1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by [their] own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*Id.*

■■■■ For this motion, the defendants maintain that they have ten different items of "newly discovered" evidence which should warrant a new trial. First, the defendants claim that Rhoades has now recanted his trial testimony in an affidavit which they submitted to the court. The court finds that this affidavit is consistent with Rhoades' testimony at trial, as discussed above. Therefore, it is not newly discovered evidence.

■■■■ Defendants again assert the existence of an attorney-client relationship between Stinson, Mag & Fizzell, Greif, and Midland. While the defendants now claim that they did not know of the existence of this relationship at trial, they already admitted that they knew about the relationship in

their supporting memorandum for the § 2255 motion. For this reason, the court finds that this does not qualify as newly discovered evidence. Even if it were, it would not produce an acquittal for the reasons discussed above.

■■■■ Defendants claim that the criminal referral filed by Herndon is also newly discovered evidence. The court has already addressed this allegation above and finds it to be without merit.

Defendants have also submitted an affidavit from one of the defendants' trial attorneys which states that the criminal referral is new and material evidence. As discussed above, the court finds this allegation to be without merit because Herndon was cross-examined about the referral at trial.

Defendants also claim that the interrogatories from Herndon that they submitted prove that Herndon's testimony at trial was false and that the indictment was flawed. The court finds nothing in these interrogatories that is inconsistent with Herndon's testimony at trial. Therefore, the court finds this allegation to be without merit.

■■■■ Defendants also claim that the affidavits of Henry, McCallister, and Wirken are also newly discovered evidence which would warrant a new trial. The court finds that these potential witnesses were available and known at the time of trial; therefore, the affidavits of these three attorneys are not newly discovered evidence.

■■■■ Defendants also claim that the affidavit submitted from Kevin Bachkora, an accountant for the defendants, outlines his responsibility and participation in determining proper disbursement of funds from the line of credit to creditors other than First State. The court notes, initially, that this affidavit merely states that Bachkora prepared a list of outstanding tax liens for the defendants while they were negotiating with Midland and the list of tax liens is attached to the affidavit. Again, this is not newly discovered evidence since this witness and list were known at trial. Furthermore, the court fails to see how this evidence would have made an acquittal more likely.

█ Finally, defendants claim that the evidence that Rhoades was banned from employment in the banking industry would warrant a new trial based on newly discovered evidence. While the court agrees that this is newly discovered evidence, the defendants have not shown that this evidence would be used for any purpose other than impeaching Rhoades. Nor have the defendants shown how this evidence would be material to the issues involved or how this evidence would produce an acquittal. Since they have not proven all five elements with regard to this claim, the defendants have not shown that a new trial is warranted. *See United States v. Neverdal,* 785 F.Supp. 123, 125 (D.Mont. 1990) ("Evidence that merely provides a different way to impeach the witness is not grounds for acquittal or a new trial when Defendant had the opportunity to impeach through cross-examination and other witnesses"). Therefore, the court finds that this motion must be denied.

### G. Other Pending Motions

Because of the result reached on the issues raised in the defendants' Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. 120) and the defendants' Motion for New Trial (Doc. 126), the court finds that it is not necessary to rule on the merits of the remaining motions submitted by the defendants. Therefore, those motions will be denied.

### H. Certificate of Appealability

█ Pursuant to 28 U.S.C. § 2253(c) and Rule 22(b) of the Federal Rules of Appellate Procedure, no movant may appeal a district court's decision denying a 28 U.S.C. § 2255 motion without a certificate of appealability issued by a district judge or circuit judge. The certificate of appealability may issue only if the defendant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). In *Lennox v. Evans,* 87 F.3d 431, 433 (10th Cir.1996), *overruled on other grounds by United States v. Kunzman,* 125 F.3d 1363 (10th Cir.1997), the Tenth Circuit Court of Appeals held that the standard established for the issuance of a certificate of appealability is the same as that governing the issuance of a certificate of probable cause as set forth in *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394–95, 77 L.Ed.2d 1090 (1983), i.e., the defendant must make "a substantial showing of the denial of a federal right."

For the same reasons discussed above, the court finds that the defendants have not made "a substantial showing of the denial of a federal right." *Id.*

**IT IS THEREFORE BY THE COURT ORDERED** that the defendants' Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. 120) is denied.

**IT IS FURTHER ORDERED** that the defendants' Motion for New Trial (Doc. 126) is denied.

**IT IS FURTHER ORDERED** that the defendants' Motion to Authorize Discovery (Doc. 137), defendants' Motion to Expand the Record and for Other Appropriate Relief (Doc. 136), defendants' Motion for Evidentiary Hearing (Doc. 140), and defendants' Motion for Pre–Trial Conference (Doc. 143) are denied.

**IT IS FURTHER ORDERED** that the defendants are denied a certificate of appealability.

### *MEMORANDUM AND ORDER*

█ This matter is before the court on defendants' Motion to Modify, Set Aside or Correct Judgment Pursuant to Local Rule 7.3, F.R.A.P. Rule 59(e) and 60(b),[1] or In the Alternative, Motion to Modify Conditions of Release Pursuant to Fed. R. Crim. Pro. 35 (Doc. 153) and defendants' Motion for Leave to File Reply to Government's Response to Post–Decision Motions (Doc. 157). The court entered its Memorandum and Order (Doc. 151) denying the defendants' previous motions on December 8, 1997. The defendants filed a notice of appeal on December 17,

1. The court assumes that the defendants are referring to Rules 59(e) and 60(b) of the Federal Rules of **Civil** Procedure since the court has been unable to locate such rule numbers in the Federal Rules of **Appellate** Procedure, as cited by the defendants.

1997. The defendants filed their motion to reconsider (Doc. 153) with this court on December 22, 1997.

■ The filing of a notice of appeal "is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Stewart v. Donges,* 915 F.2d 572, 575 (10th Cir.1990) (citation omitted). Accordingly, defendants' motion to reconsider pursuant to D. Kan. Rule 7.3 must be denied as this court was divested of its jurisdiction to consider the matters presented by the defendants upon the filing of their notice of appeal.

■ Although defendants ask the court, in the alternative, to consider their motion as one pursuant to Rule 35 of the Federal Rules of Criminal Procedure, the court agrees with the government that Rule 35 is not applicable in this case. Rule 35(a) allows the court to correct a sentence which was reversed on appeal. Since defendants' convictions were affirmed on appeal, this subsection is not applicable. Rule 35(b) allows the government to file a motion to reduce a defendant's sentence for substantial assistance within one year after the sentence was imposed. That did not happen in this case; thus, this subsection is also inapplicable. Finally, Rule 35(c) allows the court to correct technical errors in a sentence within seven days after imposition. Clearly, this subsection does not apply to this case. Therefore, this motion must also be denied.

Because the court finds that the defendants' Motion to Modify, Set Aside or Correct Judgment Pursuant to Local Rule 7.3, F.R.A.P. Rule 59(e) and 60(b), or In the Alternative, Motion to Modify Conditions of Release Pursuant to Fed. R.Crim. Pro. 35 (Doc. 153) must be denied, the defendants' Motion for Leave to File Reply to Government's Response to Post–Decision Motions (Doc. 157) must also be denied as moot.

■ Furthermore, the court notes that defendants' attorney Sean D. O'Brien is not in compliance with D. Kan. Rule 83.5.4(a) and (c), which states as follows:

(a) Persons not admitted to practice in this court who are members of good standing of the bar of another state or of the bar of another federal court may, upon motion made by a member of the bar of this court in good standing, be admitted for the purposes of a particular case only, subject to the following conditions:

(1) The motion shall be in writing; and

(2) The motion shall be accompanied by an affidavit signed by the visiting lawyer which shall include:

(A) The full name of the affiant;

(B) the address and telephone numbers of the affiant;

(C) the name of the firm or letterhead under which the affiant practices;

(D) the dates and places of admission to all bars, state or federal, and registration numbers, if any; and

(E) a recitation that the affiant is in good standing in all bars of which he or she is a member and that no disciplinary or grievance proceedings have been filed or are pending (if disciplinary proceedings have been filed, the court, case name, docket number, and disposition shall be set forth).

The motion and affidavit shall be accompanied by payment of a registration fee in the sum of $10.00. If an attorney has paid a registration fee for an appearance pro hac vice, no other pro hac vice registration fee shall be required to be paid by that attorney during the same calendar year. . . .

. . .

(c) All pleadings or other papers signed by an attorney admitted pro hac vice **shall also be signed by a member of the bar of this court** in good standing who shall participate meaningfully in the preparation and trial of the case or proceedings to the extent required by the court. . . . (Emphasis added.)

Mr. O'Brien is not listed as a member of the bar of this court. Nor has the court found any record that a pro hac vice motion has been filed in this case on behalf of Mr. O'Brien. The court does not believe that Mr.

O'Brien's submission of these motions or his signature for C. Maxwell Logan on both of these motions complies with the intent of this rule. Although the court regrets that this did not come to the court's attention prior to this, the court will not accept any further pleadings from Mr. O'Brien in this case. Any further pleadings must be submitted only by C. Maxwell Logan.

IT IS THEREFORE BY THE COURT ORDERED that defendants' Motion to Modify, Set Aside or Correct Judgment Pursuant to Local Rule 7.3, F.R.A.P. Rule 59(e) and 60(b), or In the Alternative, Motion to Modify Conditions of Release Pursuant to Fed. R.Crim. Pro. 35 (Doc. 153) is denied.

IT IS FURTHER ORDERED that defendants' Motion for Leave to File Reply to Government's Response to Post–Decision Motions (Doc. 157) is denied as moot.

IT IS FURTHER ORDERED that any further pleadings in this case must be submitted only by C. Maxwell Logan. The court will not consider any further pleadings in this case which are submitted by Sean D. O'Brien.